# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Case No. 2:16-cr-00350-KJD-NJK |
| ) | |
| vs. ) | ORDER |
| ) | |
| MIRKO ZEPPELLINI, ) | (Docket No. 74) |
| ) | |
| Defendant. ) | |

Pending before the Court is the United States' motion for psychiatric treatment. Docket No. 74. The Court has considered the United States' motion, the United States' sealed proposed treatment plan, Defendant's response, and Defendant's sealed psychiatric examination and evaluation. Docket Nos. 74, 75, 83, 84. The United States did not file a reply, and the time to do so has now expired. *See* Docket. The Court finds the motion properly resolved without a hearing.[1]

**I.    BACKGROUND**

On November 30, 2016, a federal grand jury sitting in Las Vegas, Nevada, issued an indictment charging Defendant Mirko Zeppellini with four counts of wire fraud, in violation of Title 18, United States Code, Section 1343, and three counts of money laundering, in violation of Title 18, United States Code,

---

[1] The United States' motion does not request a hearing before the Court. *See* Docket No. 74. Defendant requests a hearing only in the event that "the Court is inclined to consider the government's request." Docket No. 83 at 2. As the Court finds that the United States has failed to meet its burden, the Court deems a hearing unnecessary.

Sections 1956(a)(1)(B)(i) and 2. Docket No. 1. Defendant was arrested on December 8, 2016, and made his initial appearance on the same date. Docket Nos. 5, 12. After a detention hearing, Defendant was ordered detained pending trial. Docket Nos. 5, 11.

On February 17, 2017, after a hearing with Defendant and his then-counsel, the Court found that it had reasonable cause to believe Defendant may be suffering from a mental disease or defect that rendered unable to understand the nature of the proceedings against him or properly assist his defense. The Court therefore ordered a mental competency evaluation of Defendant. *See* Docket No. 23. On May 8, 2017, after receiving the forensic evaluation of Defendant, the Court found Defendant currently incompetent to stand trial and ordered him placed in a facility for competency restoration. Docket Nos. 43, 46.

On November 27, 2017, the Court held a status conference regarding Defendant's competency. Docket No. 64. *See also* Docket No. 65. The United States submitted that, based on Defendant's failure to obtain competency, it would ask for involuntary medication to restore his competency. Docket No. 64. The United States has now moved the Court to order involuntary medication with antipsychotics under *Sell v. United States*, 539 U.S. 166 (2003).[2]

## II. ANALYSIS

A criminal defendant "has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.'" *Sell*, 539 U.S. at 178 (quoting *Harper*, 494 U.S. at 221). Antipsychotic medications affect cognition, concentration, behavior, and demeanor, and cause a personality change that, "if unwanted, interferes with a person's self-autonomy, and can impair his or her ability to function in particular contexts." *United States v. Williams*, 356 F.3d 1045, 1054 (9th Cir. 2004). Additionally, these drugs "can have serious, even fatal, side effects." *Id*. (quoting *Harper*, 494 U.S. at 229-230).

"The government is allowed to medicate a defendant involuntarily for the purpose of rendering him

---

[2] Both parties agree that Defendant does not represent a threat to himself, others, or the safety and security of the institution in which he is housed. Therefore, the United States moves for involuntary medication solely through a *Sell* order, and not through a *Harper* order. *See Washington v. Harper*, 494 U.S. 210 (1990).

competent to stand trial only in rare circumstances." *United States v. Ruix-Gaxiola*, 623 F.3d 684, 687 (9th Cir. 2010). "When the government seeks to medicate a defendant involuntarily for competency purposes, it must establish by clear and convincing evidence the four *Sell* factors." *United States v. Gillenwater*, 749 F.3d 1094, 1100 (9th Cir. 2014). Those factors are: (1) "that important governmental interests are at stake[;]" (2) "that involuntary medication will significantly further" those interests; (3) "that involuntary medication is necessary to further those interests[;]" and (4) "that administration of the drugs is medically appropriate." *Sell*, 539 U.S. at 180–81. The Sell factors "do not represent a balancing test, but a set of independent requirements, each of which must be found to be true before the forcible administration of psychotropic drugs may be considered constitutionally permissible." *Ruiz-Gaxiola*, 623 F.3d 684 at 691.

"Orders authorizing involuntary medication pursuant to this standard are 'disfavored.'" *Id*. at 688 (quoting *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005)). The Court has "refus[ed] to permit involuntary medication except in highly-specific factual and medical circumstances." *Ruiz-Gaxiola*, 623 F.3d at 691 (quoting *Rivera-Guerrero*, 426 F.3d at 1136).

The Court therefore analyzes each *Sell* factor in turn.

**A.  Important Governmental Interests**

The first factor of the *Sell* test requires the United States to establish "that *important* governmental interests are at stake." *Sell*, 539 U.S. at 180. The government has an important "interest in bringing to trial an individual accused of a serious crime." *Id*. "That is so whether the offense is a serious crime against the person or a serious crime against property." *Id*. To determine whether a crime is serious enough to satisfy the first *Sell* factor, "the U.S. Sentencing Guidelines range is 'the appropriate starting point' because it is the 'best available predictor of the length of a defendant's incarceration.'" *United States v. Onuoha*, 820 F.3d 1049, 1044-1055 (9th Cir. 2016) (quoting *United States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2007).

"But the Guidelines range is only the starting point in determining whether the government has an important interest in prosecution." *Onuoha*, 820 F3d at 1055 (internal citation omitted). In *Sell*, the Supreme Court found that courts also "must consider the facts of the individual case in evaluating the Government's interest in prosecution." 539 U.S. at 180. Therefore, the Sentencing Guidelines range is

not "the only factor that should be considered" because it does "not reflect the full universe of relevant circumstances." *Hernandez–Vasquez*, 513 F.3d at 919. Other relevant circumstances can "include the time a defendant has served while awaiting trial and the possibility of future civil confinement" and, if a defendant has prior convictions, "the predatory nature of those offenses[ ] and the closeness in time of the prior offenses to the current prosecution." *Id*. Additionally, courts have considered the specific facts of the alleged crime. *Onuoha*, 820 F.3d at 1055. *See id.* (despite low Guidelines range and lack of criminal history, defendant's charged conduct of phoning airport officials urging evacuation on the anniversary of the September 11th attacks threatened "the basic human need for security" and therefore satisfied the first *Sell* factor); *Gillenwater*, 749 F.3d at 1101 (defendant's threats to choke, rape, and kill government officials and employees was sufficiently serious criminal conduct to satisfy the first *Sell* factor despite low Guidelines range of 33 to 41 months); *Ruiz–Gaxiola*, 623 F.3d at 694 (court considered defendant's' extensive criminal history in concluding crime at issue sufficiently serious); *Hernandez–Vasquez*, 513 F.3d at 919 (same).

Here, the United States submits that, if convicted, Defendant's Guidelines range is 57 to 71 months. Docket No. 74 at 4. The United States further submits that Defendant "carried out an elaborate scheme to convince his victims to part with more than $1,000,000 by agreeing to name them as officers and investors in a business," and by then "unilaterally removing his victims from the business accounts and transferring the money from the business to accounts unrelated to the business." *Id*. at 5. The United States contends that the offenses charged and the facts underlying those offenses, combined with the Guidelines range, establish an important governmental interest for the purpose of the first *Sell* factor. *Id*. The United States notes that Defendant has been in continuous custody on the instant case since December 8, 2016, but contends that this fact does not mitigate against a finding under the first *Sell* factor. *Id*. at 5-6.

In response, Defendant agrees that his potential Guidelines range is 57-71 months, which falls within the range of cases the Ninth Circuit has previously found to be "indicative of a serious crime." Docket No. 83 at 6. Defendant submits, however, that the instant case is different as this case is solely a property crime with "no alleged physical injury" and no alleged "threats of physical injury." *Id*. Further, Defendant submits that at least one victim has already obtained a civil judgment against him for its alleged financial loss, and that remaining victims can follow the same course. *Id*. at 6-7. Additionally, Defendant

4

submits that he has no prior criminal history. *Id*. at 7. Finally, Defendant submits that he has already been in custody for a significant period of time and that, he will likely remain in custody for more than another year before sentencing. *Id*. at 7-8. Defendant therefore submits that the specific factors of the instant case do not meet the first *Sell* factor. *Id*.

The Court finds that, under the applicable caselaw, this is a close issue. Although Defendant's Guidelines range is within the range that the Ninth Circuit has found to constitute an important governmental interest, those cases involved threats of physical harm and/or physical harm itself. Further, Defendant has no criminal history, and has already been in custody for over 15 months. The Court's finding that this is a close issue may mean that the United States has failed to prove this factor by clear and convincing evidence. The Court need not make that final determination, however, as the Court finds that the United States has failed to prove the remaining *Sell* factors.

### B. Involuntary Medication Will Significantly Further Interest in Prosecuting Case

Under the second *Sell* factor, the United States must establish that "involuntary medication will *significantly further*" its interests in prosecuting Defendant for the charged offense. *Sell*, 539 U.S. at 181. This factor requires the United States to prove (1) that "administration of the drugs is substantially likely to render the defendant competent to stand trial;" and (2) that "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id*.

The United States presents a Proposed Treatment Plan, written by Robert G. Sarrazin, M.D., who is Chief of Psychiatry at the U.S. Medical Center for Federal Prisoners in Springfield, Missouri. Docket No. 75. This plan diagnoses Defendant with Delusional Disorder, persecutory and grandiose types. *Id*. at 2. In support of the second *Sell* factor, the United States submits that Dr. Sarrazin "opines in the Proposed Treatment Plan that 'there is a substantial probability that [Defendant's] competency status can be restored with a period of treatment with antipsychotic medication.'" Docket No. 74 at 7. *See also* Docket No. 75 at 16. The United States further submits that Dr. Sarrazin "opines 'the proposed treatment with antipsychotic medications is unlikely to adversely affect [Defendant's] cognition and is in fact more

likely to enhance it.'" Docket No. 74 at 7. *See also* Docket No. 75 at 7.[3] The United States submits that Dr. Sarrazin "notes 'the majority of the *common and troublesome side effects of the medications* can be reduced or eliminated with competent psychiatric oversight and management.'" Docket No. 74 at 7 (emphasis added). *See also* Docket No. 75 at 15. Finally, the United States submits that it is Dr. Sarrazin's opinion that involuntary medicating Defendant with antipsychotic medication "will substantially likely [sic] render him competent to stand trial. Docket No. 74 at 7. *See also* Docket No. 75 at 11.

In response, Defendant submits that the Treatment Plan, despite diagnosing Defendant with delusional disorder,[4] focuses on treatment for schizophrenia and studies regarding treatment for schizophrenia. Docket No. 83 at 9. Defendant notes that delusional disorder is a "separate and distinct illness from schizophrenia in numerous ways," and points out many of the differences. *Id*. Defendant's expert, Norman Roitman, M.D., a board-certified psychiatrist, states that, as a result, the BOP treatment plan is akin to "talking about a treatment for cancer in a patient who does not have a cancer diagnosis." Docket No. 84 at 47. Defendant notes that delusional disorder does not have a known origin or treatment, or a long history of studies like those focusing on schizophrenia. Docket No. 83 at 9-10. Dr. Roitman submits that, for someone like Defendant with a fixed delusion that the government is working against him, forceful medication will have an agitating effect. *Id*. at 10. *See also* Docket No. 84 at 48-49.

As the United States has conflated Defendant's diagnosis with the disorder of schizophrenia, Dr. Roitman submits that the proposed "treatment is not aimed at [Defendant's] disorder and there is no science to predict a positive outcome." Docket No. 83 at 10. *See also* Docket No. 84 at 46. Defendant submits that the studies in the treatment plan cannot support this factor, as all but one relate to

---

[3]Contrary to the United States' contention that Dr. Sarrazin "opine[d]" that the treatment would more likely enhance Defendant's cognition than impair it, Dr. Sarrazin stated that *data* that he had cited regarding the effects of antipsychotic medications on schizophrenic patients *suggests* this conclusion. Docket No. 75 at 6-7. Dr. Sarrazin appears to make no effort to apply the data on schizophrenic patients to patients with the disorder with which he has diagnosed Defendant. *Id*.

[4]Defendant also submits that Dr. Sarrazin's diagnosis of delusional disorder is not a valid diagnosis for many reasons. Docket No. 83 at 11-12. While the Court agrees with Defendant's concern, the Court need not address it as the United States has failed to prove the second *Sell* factor even if its diagnosis of Defendant is valid.

schizophrenia and not delusional disorder. Docket No. 83 at 13. Defendant submits that the one study regarding delusional disorder, the Herbel Analysis, is 10 years old, involved only 22 subjects, and did not include a control group. *Id*. Finally, Defendant submits that insufficient data exists for "restoration rates of delusional disorder through antipsychotic medication and, thus, the treatment plan "incorrectly estimates the likelihood of restoration." *Id*. at 14. For the many reasons cited in his evaluation of Defendant, Dr. Roitman believes that forced medication has little chance of restoring Defendant to competency. *Id*. *See also* Docket No. 84.

The United States failed to reply to Defendant's response. Therefore, the contentions made by Defendant regarding the applicability of schizophrenia studies and treatment to delusional disorder remain unrebutted. *See Garcia v. Dawahare*, 2006 WL 2583745, *2 (D.Nev. Sept. 6, 2006) (Dawson, J.) (failure to file reply is consent that other party's argument is correct). *See also United States v. Cobb*, 2015 WL 518543 *4, n.1 (D.Nev. Feb. 9, 2015) (Gordon, J.) (failure to address argument in reply is a concession that the argument is correct).

The *Ruiz-Gaxiola* Court addressed delusional disorder and the potential treatments for it. The Court found that, according to the Merck Manual, treatment for delusional disorder "aims to establish an effective physician-patient relationship and to manage complications." *Ruiz-Gaxiola*, 623 F.3d at 697. Further, the manual states that "[i]nsufficient data is available to support the use of any particular drug" in treating delusional disorder, "although antipsychotics sometimes suppress symptoms. *Id*. The Court noted the many problems with the Herbel Study, including its own caution that the opinions of the forensic examiners "may have been biased in favor of finding a positive response to treatment." *Id*. at 697-698. As the Court stated, "[b]y their own terms, the findings of the Herbel Study are both limited and tentative. Certainly, they do not constitute clear and convincing evidence that involuntarily medicating [Defendant], who is not even a 'persecution subtype' is substantially likely to restore him to competency." *Id*. at 698.[5]

The United States has thus failed to demonstrate by any evidence, much less clear and convincing, that involuntary medication will significantly further its interest in prosecuting Defendant for the offenses

---

[5]In the instant case, Dr. Sarrazin has diagnosed Defendant as both a persecution and a grandiose subtype. Docket No. 75 at 2.

charged.

### C. Involuntary Medication is Necessary to Further Government Interest

Under the third *Sell* factor, the United States must establish that "involuntary medication is *necessary* to further" its interest in prosecuting Defendant for the charged offense. *Sell*, 539 U.S. at 181. As stated by the Court in Ruiz-Gaxiola, "if a proposed treatment will not further the government's interest in prosecution, as required under the second *Sell* factor, it could not possibly provide a *necessary* means of doing so." 623 F.3d at 701. This third factor "thus assumes that the government has established the second factor, and it then requires it to prove by clear and convincing evidence 'that any alternative, less intrusive treatments are unlikely to achieve substantially the same results.'" *Id*. (quoting *Sell*, 539 U.S. at 181).

The United States submits that, according to Dr. Sarrazin, Defendant "currently ... cannot be engaged in any type of therapeutic task to attempt to reduce the intensity of his psychotic symptoms because he does not believe these symptoms are a result of a mental illness." Docket No. 74 at 8. *See also* Docket No. 75 at 11. The United States further submits that "alternative, less intrusive treatments are unlikely to achieve substantially the same results of restoring [Defendant] to competency." Docket No. 74 at 8. *See also* Docket No. 75 at 11.

Defendant submits that, under the treatment plan, it appears that the drug Haldol, a first-generation antipsychotic, is the drug most likely to be administered first to him. Docket No. 83 at 15. The treatment plan indicates that, five days after the first dose, if Defendant refuses to take oral medications, he will be injected with long-acting Haldol, and will continue to be injected with long-acting Haldol every two, three, or four weeks. *Id*. at 16. This dosage, Defendant submits, exceeds the standard of care. *Id*. Dr. Roitman has found that the large, potentially toxic, doses of Haldol are not appropriate, particularly in a patient diagnosed with a disorder for which antipsychotics have not been proven effective. *Id*. *See also* Docket No. 84 at 64-65. Defendant further submits that first-generation antipsychotics, particularly Haldol, have the largest risk of side effects, and that the large dosages in the treatment plan would not allow doctors to monitor Defendant's side effects. Docket No. 83 at 16-17. Dr. Roitman states that Haldol should not be used because it is likely to cause physical side effects that will strengthen Defendant's belief that the medication is toxic, without any proven beneficial effect. Docket No. 84 at 64. Finally, Dr. Roitman

concludes that there are non-medication alternatives to restoring Defendant's competency - which are clearly less intrusive - but have not been attempted by the United States. Docket No. 84 at 71.

The United States failed to reply to Defendant's response. Therefore, Defendant's contentions regarding the inappropriateness of Haldol, the severity of its potential side effects, and the availability of less-intrusive means remain unrebutted.

The United States cannot possibly prove the third *Sell* factor as it failed to prove the second *Sell* factor. *Ruiz-Gaxiola*, 623 F.3d at 703. Nonetheless, the Court finds that the United States has failed to prove the third *Sell* factor on its own merits.

### D. Involuntary Medication is Not Medically Appropriate

Under the fourth *Sell* factor, the United States must prove that the "administration of the drugs is *medically appropriate*." *Sell*, 539 U.S. at 181. The United States must establish that the proposed regime of involuntary medication is "in the patient's best medical interest in light of his medical condition." *Ruiz-Gaxiola*, 623 F.3d at 703.

The United States has clearly failed to meet its burden. It wants to administer drugs to a defendant it has - perhaps invalidly - diagnosed with delusional disorder based on the studies of the same drugs administered to patients with an entirely different disorder. There is no scenario in which this action can be considered medically appropriate. Therefore, the Court finds that the United States has failed to prove the fourth *Sell* factor.

## III. CONCLUSION

For the reasons stated above, the Court finds that the United States has not met its burden under *Sell*. Accordingly, the United States' motion to involuntarily medicate Defendant, Docket No. 74, is hereby **DENIED**. No later than April 3, 2018, the parties shall file a joint statement with the Court regarding the status of this case.

IT IS SO ORDERED.

DATED: March 23, 2018.

_____
NANCY J. KOPPE
United States Magistrate Judge